# Exhibit 8
# Jassy Declaration

**EXHIBIT 1**

Page 1

1                    UNITED STATES DISTRICT COURT

                    MIDDLE DISTRICT OF LOUISIANA

2

3     JANE DOE                        CIVIL ACTION NO.

                                     3:22-CV-00338-BAJ-SDJ

4     VERSUS

5     BOARD OF SUPERVISORS OF         JUDGE BRIAN A. JACKSON

      THE UNIVERSITY OF

6     LOUISIANA SYSTEM; BOARD OF      MAGISTRATE JUDGE

      SUPERVISORS OF LOUISIANA        SCOTT D. JOHNSON

7     STATE UNIVERSITY AND

      AGRICULTURAL AND

8     MECHANICAL COLLEGE; and

      LAFAYETTE CITY-PARISH

9     CONSOLIDATED GOVERNMENT

10

11    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12          TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

13                          JANE DOE,

14    TAKEN ON BEHALF OF BOARD OF SUPERVISORS OF THE

15    UNIVERSITY OF LOUISIANA SYSTEM, REPORTED IN THE ABOVE

16    ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

17    CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

18    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

19

20          REPORTED AT THE LAW OFFICES OF:

21          CAZAYOUX EWING LAW FIRM

22          257 MAXIMILIAN STREET

23          BATON ROUGE, LOUISIANA  70802

24    Job No. CS6079529

25          COMMENCING AT 10:04 A.M., ON SEPTEMBER 20, 2023

Page 2

```
1                    A P P E A R A N C E S
2
3        FOR THE PLAINTIFF:
4            THE FIERBERG NATIONAL LAW GROUP, LLP
             (BY:  MONICA H. BECK, ESQ.)
5            201 EAST 17TH STREET, SUITE A
             TRAVERSE CITY, MICHIGAN  49684
6            (231) 933-0180
             mbeck@tfnlgroup.com
7
8
         FOR BOARD OF SUPERVISORS OF THE UNIVERSITY OF
9        LOUISIANA SYSTEM:
10           JEFF LANDRY, ATTORNEY GENERAL
             (BY:  CATHERINE S. GIERING, ESQ.)
11           (BY:  ANDREW BLANCHFIELD, ESQ.)
             701 MAIN STREET
12           BATON ROUGE, LOUISIANA  70801
             (225) 383-3796
13           cathygiering@gmail.com
             ablanchfield@keoghcox.com
14
                      - AND -
15
         TAYLOR, WELLONS, POLITZ & DUHE, LLC
16           (BY: COREY L. PIERCE, ESQ.)
             4041 ESSEN LANE, SUITE 500
17           BATON ROUGE, LOUISIANA  70809
             (225) 387-9888
18           cpierce@twpdlaw.com
19                   - AND -
20       DECUIR, CLARK & ADAMS, LLP
             (BY:  BRANDON J. DECUIR, ESQ.)
21           732 NORTH BOULEVARD
             BATON ROUGE, LOUISIANA  70802
22           (225) 346-8716
             brandon@decuirlaw.com
23
24
25
```

Page 3

1                A P P E A R A N C E S  (Continued)

2

3      FOR LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT:

4           BORNE WILKES AND RABALAIS LLC
            (BY:  GRANT R. SCHEXNAILDER, ESQ.)

5           200 WEST CONGRESS STREET, SUITE 1000
            LAFAYETTE, LOUISIANA  70501

6           (337) 232-1604
            schexnailder@bornewilkes.com

7

8

       ALSO PRESENT:

9

            JEFFREY HORNER, VIDEOGRAPHER

10

11

       REPORTED BY:

12

            YOLANDA J. PENA

13          CCR NO. 2017002, RPR
            STATE OF LOUISIANA

14

15

16

17

18

19

20

21

22

23

24

25

Page 91

1      Q.   Has anyone reached out to you by text?

2      A.   No.

3      Q.   Has anyone reached out to you on any social

4 media platform?

5      A.   No.

6      Q.   Has anyone confronted you in person?

7      A.   No.

8      Q.   In your complaint, you allege that LSU banned

9 Silva from LSU's campus in the spring of 2015.  What

10 evidence do you have that LSU banned Silva from the

11 campus?

12     A.   I was not aware of this until the Kenny Jacoby

13 article came out.  I believe that was something in --

14 in the Kenny Jacoby article, or if not, it was

15 something that was uncovered by my attorney.  And so

16 I'm assuming that those are -- the evidence of that is

17 in the hands of either Kenny Jacoby or my attorney.

18     Q.   Okay.  So your only -- as you sit here today,

19 the only information you have about LSU banning Victor

20 Daniel Silva from its campus is -- arises out of the

21 Kenny Jacoby article?

22     A.   Yes.

23     Q.   You independently do not have any other

24 information other than what is in the Kenny Jacoby

25 article?

Page 92

1        A.    Correct.

2        Q.    In your complaint, you allege that it was a

3    fluke that a -- I'm going -- I'm going to refer to the

4    University of Louisiana at Lafayette as ULL.

5        A.    Okay.

6        Q.    -- that it was a fluke that a ULL

7    administrator learned of Silva's arrest -- I'm

8    referring to Victor Daniel Silva as Silva.  Is that

9    fair?

10       A.    That's fair.

11       Q.    Okay.  So I'll start over one more time.

12             It was a fluke that a ULL administrator

13    learned of Silva's arrest for rape in Baton Rouge.

14    What do you mean by "fluke"?

15       A.    Again, this is all information that I do not

16    know firsthand, so this is stuff that -- information

17    that I have received either from my attorney or from

18    the Kenny Jacoby article.

19       Q.    Okay.  That's fair.

20             What information do you have that a ULL

21    administrator learned of Silva's arrest for rape in

22    Baton Rouge?

23             MS. BECK:  Objection; asked and

24        answered.

25             You can -- you can answer.

```
                                               Page 93
1        BY MS. GIERING:
2              Q.   Is your answer any different than the question
3        I asked about it being a fluke?
4              A.   No, ma'am.
5              Q.   Okay.  So you don't have any information
6        independently?
7              A.   Independently, no.
8              Q.   Okay.  Thank you.
9                   Your complaint goes on to say that "certainly
10       not through any formal notification from LSU or its
11       Title IX office."
12                  Do -- what do you mean by "formal
13       notification"?
14             A.   Again, this is information that I do not have
15       independently or firsthand.  This is information that I
16       received from Kenny Jacoby, the journalist, and my
17       attorney.
18             Q.   Okay.  What evidence do you have that ULL
19       never followed up with LSU or Baton Rouge law
20       enforcement for additional information concerning
21       Silva?
22             A.   I can only speak to what I experienced with
23       Ruston PD and Louisiana Tech University.  That's
24       information that Kenny Jacoby and my attorney would
25       have known.
```

Page 94

1      Q.   Okay.  And I'm going to be asking a series of

2   questions.

3      A.   Yes.

4      Q.   If that same answer applies, if it's okay with

5   your attorney, in the interest of time, you can just

6   say "I have no independent information."

7      A.   Okay.

8              MS. GIERING:  Is that fair?

9              MS. BECK:  Yes, that's fair.

10  BY MS. GIERING:

11     Q.   Okay.  In your complaint, it says -- what do

12  you mean by ULL "merely placed Silva on disciplinary

13  probation"?

14     A.   I have no independent information.

15     Q.   What evidence do you have that the UL

16  System -- and I'm going to pause here.

17             Are you aware that ULL and Louisiana Tech

18  University are two of many universities that are part

19  of what is referred to as the University of Louisiana

20  System?

21     A.   Yes.

22     Q.   Okay.  And I am going to refer to that system

23  as the UL System.  Is that fair?

24     A.   That's fair.

25     Q.   Okay.  What evidence do you have that the UL

Page 95

```
 1    System knew about Silva's arrest in Baton Rouge?
 2                  MS. BECK:  I'm going to object to this
 3             question to the extent it calls for a legal
 4             conclusion.
 5                  And with that, you can answer.
 6         A.   Can you state it one more time?  I'm sorry.
 7    BY MS. GIERING:
 8         Q.   Yes.  Subject to the same objection, what
 9    evidence do you have that UL System knew about Silva's
10    arrest in Baton Rouge?
11         A.   I have no independent information.
12         Q.   What evidence do you have that supports your
13    allegation that UL System, Louisiana Tech University,
14    or ULL "took no steps to protect female tech students
15    from Silva or even provide them the information they
16    needed to protect themselves"?
17         A.   I can only speak to Louisiana Tech in this
18    answer --
19         Q.   Okay.
20         A.   -- because that's who I have personal
21    experience with.  After -- I was not provided by
22    Carrie Flournoy, who was the Title IX officer, with any
23    paperwork having to do with her as -- as a Title IX
24    officer.  And then of course after the Kenny Jacoby
25    article came out, I found out then -- and of course,
```

Page 96

1    again, that's not independent information, so I suppose

2    I can't speak to it.  But I found out then that they

3    had not communicated or withheld his transcript.

4         Q.   Okay.  So for that latter part of your answer,

5    you said after the article, you learned that Tech had

6    not communicated or withheld his transcript.  Am I --

7         A.   Correct.

8         Q.   Did I accurately state -- state that?

9         A.   Yes.

10        Q.   And so my understanding of that answer is that

11   the article is where you gained information that Tech

12   had not communicated and had not withheld Silva's

13   transcript; is that correct?

14        A.   Correct.  And it may also be my own attorney's

15   findings.  I'm not sure --

16        Q.   Okay.

17        A.   -- where -- yeah.

18        Q.   Okay.  I'm taking your attorney's find- --

19   your attorney's findings out of it.  I'm -- your --

20   your knowledge and --

21        A.   Yep.

22        Q.   -- your information.  Okay.

23             You said you were not provided, by Carrie

24   Flournoy, any paperwork.  What do you mean by that?

25        A.   When I reported to the Title IX office at

Page 97

1    Louisiana Tech -- it was in December of 2018 -- Carrie

2    Flournoy did not inform me of who she was as a Title IX

3    officer, what my rights were under Title IX, what the

4    protocol was for Title IX cases.

5              You know, I'm not sure that -- if that

6    would've looked like paperwork or her verbally saying

7    that to me, but I was not provided with any of those

8    things.  And of course this is hindsight, that I'm

9    saying that I know that she did not do that.  At the

10   time, this was not in my head.  At -- at the time that

11   I reported to her, I assumed that she was doing her due

12   diligence and performing her job.

13        Q.   Okay.  What do you mean in your complaint that

14   the UL System, Louisiana Tech, or ULL took no steps to

15   protect female Tech students?

16        A.   I have no independent information.

17        Q.   Prior to September of 2018, did you have an

18   expectation that Louisiana Tech University was required

19   to protect female students?

20        A.   Prior to September of 2018?

21        Q.   Correct.

22             MS. BECK:  Objection.  I'm just going to

23             object, form.

24             Go ahead.

25        A.   Again, this is a "hindsight is 20/20"

Page 98

1    situation, I think.  I was a student at this

2    institution.

3    BY MS. GIERING:

4          Q.   Uh-huh.

5          A.   I had professors and people above me,

6    administrators, like a -- like an academic -- or

7    student academic adviser, things like that.  So -- so

8    I think the culture was that the university was there

9    for students.

10         Q.   Uh-huh.

11         A.   In hindsight, I -- that -- okay.  Sorry.

12   Because of that culture, I assumed that the university

13   would carry out all of the -- I had the expectation

14   that the university would -- would carry out all of the

15   due process that it could carry out in order to protect

16   its students in that -- the only way I could say this

17   is like I felt as if we were on the same team --

18         Q.   Uh-huh.

19         A.   -- me and the university, because of course,

20   why -- why would we not be.

21         Q.   Uh-huh.

22         A.   Right?  I was a student there.  And so my

23   expectations were not that -- because I didn't know I

24   would need protecting --

25         Q.   Uh-huh.

Page 99

1      A.    -- my expectations were not that they were

2      there to protect me but -- but that they were there on

3      my team.

4      Q.    Okay.

5      A.    I guess does that make sense?

6      Q.    It does make sense.  Thank you.

7            Prior to September of 2018, was there ever a

8      time that you did not feel safe at -- as a student at

9      Louisiana Tech University?

10     A.    That's tricky.  As women, I feel like there's

11     often situations in which we don't feel safe.  I went

12     to maybe one or two frat parties that I just had in the

13     back of my mind "I need to be careful here."

14     Q.    Uh-huh.

15     A.    But I -- I can't -- I can't speak specifically

16     to whether or not there were moments that I felt --

17     specific moments that I felt safe or unsafe at

18     Louisiana Tech.

19     Q.    Okay.  Now, the -- the frat parties that you

20     would go to and you -- in the back of your mind, you

21     were thinking -- well, let me ask the question.

22           What -- what were you thinking in the back of

23     your mind?

24     A.    Again, this was maybe one or two parties that

25     I attended.  And -- and usually they were "cover your

Page 305

1    came to retain them.

2           A.    My brother Calvin --

3           Q.    Uh-huh.

4           A.    -- found them.  I'm -- I'm not sure exactly

5    how they found -- he found them, but he suggested to me

6    that I contact them, and I did.

7           Q.    Okay.  And when -- approximately when was

8    that?

9           A.    It was after the Kenny Jacoby article was

10   published.  I don't know exactly how long after.

11          Q.    Were you ever approached by Kenny Jacoby to

12   interview you for his article?

13          A.    Yes.

14          Q.    When did he approach you?

15          A.    I don't exactly remember when that was.

16          Q.    What year?

17          A.    The article was pub- -- I believe that it was

18   either the end of 2019 or early 2020.

19          Q.    Okay.  And how did he contact you?

20          A.    I don't recall exactly, as I'm sitting here,

21   where our first contact was.

22          Q.    Was it an email?

23          A.    Maybe, yes.  I don't recall exactly.

24          Q.    And did you respond to his email?

25          A.    Yes.

Page 306

1      Q.    Okay.

2      A.    Or -- well, I'm sorry.  I don't know if it was

3 an email, but I did respond to whatever -- however he

4 contacted me for --

5      Q.    Was it in writing or -- whether that's

6 electronic or not, or was it by -- verbally?  Did he

7 call you?

8      A.    I believe it was in writing.

9      Q.    Okay.  And --

10      A.    I -- I can't recall exactly.

11      Q.    You don't -- do you -- do you recall if you

12 received text messages from him?

13      A.    In order to contact me for this -- or --

14      Q.    Yes.

15      A.    I don't recall if that's how he contacted me

16 for -- in order to interview me for --

17      Q.    And at some point, you said there was -- there

18 were some emails?

19           MS. BECK:  Objection; form.

20      A.    Again, I don't know exactly how he -- he and I

21 communicated.  I don't -- I don't exactly remember, as

22 I'm sitting here right now, whether it was he called me

23 or email me or texted me.  I don't exactly recall right

24 now.

25 BY MS. GIERING:

Page 307

1          Q.    Okay.  Did you provide information to him?

2          A.    Yes.

3          Q.    Did you provide documents to him?

4          A.    Not that I can recall, as I'm sitting here

5    right now.

6          Q.    Do you have those emails?

7               MS. BECK:  Objection; form.

8          A.    I -- again, I don't know if -- if I emailed

9    him or -- or what.  I provided any communication that I

10   felt would be relevant to this -- to my attorney, but

11   I -- I don't know -- as I'm sitting here right now,

12   I -- I really can't recall how that -- that

13   relationship began or -- or continued.

14   BY MS. GIERING:

15         Q.    But you did -- you -- you did participate in

16   communications with Kenny Jacoby?

17         A.    Yes.

18         Q.    And you did provide him information for his

19   article?

20         A.    Most of that was over the phone, yes.

21         Q.    Okay.  But there was some in written

22   communications?

23         A.    Again, I don't remember exactly what was in

24   written communications.  From what I can remember, as

25   I'm sitting here right now, those written

Page 308

```
 1        communications were us setting up phone calls in

 2        order to -- for him to interview me.

 3             Q.   Did you ever meet with him in person?

 4             A.   No.

 5             Q.   So you are aware he was preparing an

 6        investigative piece?

 7                       MS. BECK:  Objection; form.

 8                       You can answer.

 9             A.   Yes.  I wasn't sure the scope of that piece

10        or exactly what -- what that piece would look like, but

11        I -- I was aware that he was preparing --

12        BY MS. GIERING:

13             Q.   Did anyone on Kenny Jacoby's behalf contact

14        you about his investigative piece?

15             A.   What do you mean by on his behalf?

16             Q.   Somebody he worked with, somebody who was

17        helping him with his article, somebody who was doing

18        some investigation for him for his article?

19             A.   No, not --

20             Q.   Just him?

21             A.   -- that I can recall.  Yeah.

22             Q.   Okay.

23             A.   Yes.

24             Q.   Did he provide you with an advanced copy of

25        the article?
```

Page 309

1        A.    No.

2        Q.    Did he provide you with a copy of the article

3   after it was completed?

4        A.    No.

5        Q.    Did he tell you when it was going to be

6   published?

7        A.    Yes.

8        Q.    Okay.  And so you were looking for it whenever

9   it came out?

10        A.    Yes.

11        Q.    Did anybody send you a copy of it?

12        A.    No.  Not that -- after it was published, not

13   that I can recall.  But do you mean before it was

14   published?  I'm sorry.

15        Q.    Either.

16        A.    Certainly not before it was published.  That

17   was what my original "no" was to.  And then after it

18   was published, I -- I can't recall if -- no.  I would

19   expect not, no.

20              MS. GIERING:  Counsel, we'll -- we'll

21              send you a supplemental request for

22              production.  But we're going to call for

23              production of any writings, emails, texts,

24              anything with Kenny Jacoby and Ms. Doe.

25   BY MS. GIERING:

Page 310

1      Q.   In page 10 of your complaint, you allege that

2    you learned for the first time that defendant had

3    permitted Silva to transfer back to ULL after you

4    reported him for rape where he remained under the

5    board's control and authority as a student without

6    investigation or any disciplinary action until he

7    graduated in 2019.

8           How would stopping Silva from resigning from

9    Tech have changed what happened to you?

10                 MS. BECK:   Objection; form.

11                 You can answer, if you can.

12      A.   Sorry.  Say it one more time, just the -- just

13    the second part.

14    BY MS. GIERING:

15      Q.   How would stopping Silva from resigning from

16    Tech have changed what happened to you?

17      A.   By what "happened to you," I'm assuming you're

18    meaning --

19      Q.   The assault?

20      A.   -- the assault.

21      Q.   Yes.

22      A.   It would not have changed --

23      Q.   How would that have changed the sexual

24    assault?

25      A.   That would not have changed the assault.

Page 311

1        All of the other things alleged in the claim may have

2        changed the assault, but I guess we can't speculate

3        on that, things like him being transferred to Tech

4        without -- without a spot on his record and -- and

5        these things not being communicated.  But -- but him

6        transferring somewhere else, I suppose would not have

7        changed anything about the assault itself.  It

8        certainly did end up betraying my trust in the system,

9        right.  But yeah.  I'm sorry, yeah.

10        Q.    What information do you have that he

11        transferred from Tech?

12        A.    Is that what you just --

13        Q.    No.  I said with- -- I said "resigned."

14        A.    Oh, resigned.  I'm sorry.  I didn't mean to

15        say "transfer."

16        Q.    Okay, okay.

17        A.    Resigned from -- from Tech and ended up -- he

18        did end up attending UL Lafayette, right, after that

19        and graduated.

20        Q.    Do you know that?

21        A.    That's what it said in the Kenny Jacoby

22        article, so I'm assuming that that's correct.  So when

23        I say "transferred," I think that's what I mean.

24        Q.    Okay.  You allege several times in your

25        lawsuit that the board allowed Silva to transfer, with

Page 312

1    which we disagree, but for purposes of your deposition,

2    let's assume that Silva tried to leave Tech and could

3    not.  That would not have changed the sexual assault

4    that happened to you, correct?

5         A.   Correct.

6         Q.   Tech agreed to meet with you when you emailed

7    Carrie Flournoy on December 13th, 2018, correct?

8         A.   Correct.  And I do just want to -- I do just

9    want to make a -- a correction to my previous statement

10   where you said that him leaving would not have changed

11   my sexual assault, right?

12        Q.   Correct.

13        A.   And I know that this is a technicality, but I

14   mean, I think in -- from what I've learned in therapy

15   that, like, there are, like, secondary traumas after a

16   trauma.  And while it did not change the fact that I

17   was in that initial moment assaulted --

18        Q.   Uh-huh.

19        A.   -- I do think that it had lasting effects on

20   how I -- I processed that assault afterwards.  So I'm

21   sorry.  That was a technicality, but -- yeah.

22        Q.   Wait.  Tell me that last part again.  You do

23   think what had -- repeat that for me.

24        A.   Sure.  When I found out that he had resigned

25   from Louisiana Tech and reenrolled at ULL and graduated

Page 313

1    with a clean record, I felt that he had not been held

2    accountable in any way for what he had done to me.  I

3    had trusted that the people who I told who were

4    officials in this case -- that they were doing what

5    needed to be done behind the scenes to hold him

6    accountable for what it is that I had reported.

7          And so when I found out later via the Kenny

8    Jacoby article that -- that actually, seemingly, he --

9    he had kind of gotten off scot-free, that -- that was a

10    real, I think, blow to me and to -- it confirmed to me

11    that people would not believe me, is what it felt like,

12    that they would not believe what -- what had happened

13    to me and that they would not -- at least if they

14    believed me, that they would not take it as seriously

15    as I had taken it.

16        Q.   You did -- going back to your report.

17    You reported to the Ruston Police Department on

18    December 14th, 2018; that was a Friday.  And then

19    on Monday, December 17th, 2018, you were then -- you

20    then met with two represent- -- excuse me, two

21    administrators of Louisiana Tech University, correct?

22        A.   Correct.

23        Q.   And those were Dickie Crawford.  And who was

24    the other one?  Adam Collins?

25        A.   That sounds correct, yes.

Page 314

1          Q.   Okay.  And you met with them at what time on

2     that Monday?

3          A.   I don't recall the time.

4          Q.   And what did they tell you?

5          A.   I don't -- I don't recall the exact words, but

6     the gist of the conversation was that Daniel had -- and

7     at this point, they were using his name -- Victor

8     Daniel Silva had withdrawn from school shortly after I

9     had reported.  And it was not enough time for them to

10    get an investigation together, and so their hands were

11    tied when it came to investigating or taking any action

12    against him.

13         Q.   Uh-huh.

14         A.   They did tell me that were he to try to

15    reenroll at Louisiana Tech, I would be called to be a

16    witness for an academic misconduct hearing or something

17    like that.  And so I think from that, I kind of

18    assumed, "Oh, okay.  He's out, and he's" --

19         Q.   He's gone?

20         A.   He's gone.  And everything that's been done

21    can -- could be done -- or has been done.

22         Q.   And to be clear, they told you that he

23    withdrew from Tech University, correct?

24         A.   I think they said either withdrew or resigned,

25    maybe.

Page 315

1          Q.   Uh-huh.  Okay.  Did you take any action at

2     that point to -- did you drive by his apartment or take

3     any actions to determine if he had moved from Ruston?

4          A.   Not -- no.

5          Q.   Did you ask any friends?  Did you confirm it

6     by talking to any friends or contacts that Silva left

7     Louisiana Tech University?

8          A.   I don't recall, as I'm sitting here right now.

9          Q.   You just took -- you took their word for

10    it and --

11         A.   Yes.

12         Q.   -- that was that?

13         A.   Yes.

14         Q.   Okay.  Did you see him on campus since

15    December 17th, 2018?

16         A.   No.

17         Q.   Did you see him in Ruston after December 17th,

18    2018?

19         A.   No.

20              MS. GIERING:  Let's go off the record.

21              THE VIDEOGRAPHER:  We are going off the

22         record.  The time is 5:44.

23                   (Recess taken.)

24              THE VIDEOGRAPHER:  We are back on the

25         record at 5:50.

Page 321

1      name?

2             A.    I am not.  She likes to think so, though.

3                   MS. GIERING:  Okay.  I am going to pass

4             the witness.

5                   MR. SCHEXNAYDER:  Okay.  How much time

6             do we have left?

7                   MS. BECK:  We have about seven minutes.

8                   MR. SCHEXNAYDER:  Okay.  I don't know if

9             we're going to have enough time.  I don't have

10            many questions, but six minutes, seven minutes

11            is pretty tight.

12                  MS. BECK:  You got -- the federal rules

13            provide for seven hours.

14                  MR. SCHEXNAYDER:  All right.

15                  MS. BECK:  So got to stick to it.

16                  MR. SCHEXNAYDER:  All right.  Where do

17            you want me to do it from?

18                  MS. BECK:  Do you want to go off the

19            record?

20                  THE VIDEOGRAPHER:  Yeah, let's go off

21            the record.  We're going off the record.  The

22            time is 5:56.

23                        (Recess taken.)

24                  THE VIDEOGRAPHER:  We are back on the

25            record at 5:57.

Page 322

1                    EXAMINATION

2    BY MR. SCHEXNAYDER:

3         Q.   Ms. Doe, my name is Grant Schexnayder.  I'm

4    here on behalf of Lafayette Consolid- -- Consolidated

5    Government today.  And they're involved in this lawsuit

6    based on the allegations against the Lafayette Police

7    Department.  I know we've been here a long time today,

8    so we're going to try to get out pretty soon.

9              For starters, is your phone an Apple or

10   Android?

11        A.   It's an Apple.

12        Q.   Okay.  And what about your previous phone?

13        A.   Also Apple.

14        Q.   Okay.  Do you have any iCloud subscription or

15   any sort of cloud service provider?

16        A.   I -- I do have, like, an Apple ID.

17        Q.   Okay.  I know mine, I pay $0.99 a month for

18   iCloud storage.

19        A.   I believe that's what I do, yes.  I --

20        Q.   Okay.

21        A.   I'm not sure, as I'm sitting here.

22        Q.   Do you have any idea how long you've had that

23   subscription?

24        A.   It's been recently -- actually, I believe I

25   got it in 2020 when I got that new phone.

Page 323

1          Q.   Okay.  Earlier today, we talked about two

2     media files.  One was a Twitter screenshot, another was

3     a group chat screenshot that had Daniel Silva's photo

4     on it.  On the group chat, I believe, it was the

5     Kappa Sigma screenshot.

6               Was there any discussion, after that was sent,

7     about Victor Daniel Silva?

8          A.   I don't recall.

9          Q.   Okay.  Do you remember any messages at all

10    being sent after that screenshot?

11         A.   At this time, I don't -- I don't recall.

12         Q.   Okay.  I mean, someone posted that screenshot

13    in your separate group chat.  Are you aware of maybe

14    this screenshot went viral around campus and spread

15    around?

16         A.   I don't know anything about that particular

17    screenshot, no.

18         Q.   Okay.  Did these stories about Victor Daniel

19    Silva -- was it spread throughout campus more than just

20    to yourself or to your group of friends?

21               MS. BECK:  Objection; form.

22         A.   I don't know how much it spread.  It did

23    seem -- I can speak to my group of friends, and -- and

24    where it was spread in that group chat, yeah.

25    BY MS. GIERING:

Page 324

1       Q.   Okay.  Did you send it to anyone else?

2       A.   I don't recall at this time.

3       Q.   Okay.  What was communicated between yourself

4  and Kenneth Jacoby?

5       A.   You know, I don't recall exactly what it was.

6  I know that we focused on -- he asked me for my

7  experience, and I -- I told him.  So that was -- that's

8  what we focused on.

9       Q.   Okay.  Did he provide you with any

10  information?

11       A.   As I'm sitting here right now, I -- I don't

12  recall, yeah.

13       Q.   Okay.  Is it possible that he might have

14  provided you with information?

15       A.   It's possible.

16       Q.   Okay.  Was there any new information you

17  learned when you read his article?

18       A.   Yes.

19       Q.   If you just generally say what that

20  information was?

21       A.   I did not know -- up until that -- I guess

22  it's easiest to say what I -- that I knew up until that

23  point were all allegations, again, that -- that

24  screenshot that I had been sent.  I did not realize

25  the -- the law that he mentioned.  I did not understand

Page 325

1    the previous allegations against him and that there had

2    actually been reports to the other schools and to other

3    police departments, specifically the Lafayette Police

4    Department.  I didn't realize that there were so many

5    reports to Lafayette Police Department.  I -- there's a

6    number of things.  I can't recall them all right now,

7    but there's a number of things that I learned from that

8    article.

9         Q.   Was reading that article the first instance

10   where you -- Lafayette Police Department ever crossed

11   your mind as it related to Victor Daniel Silva?

12        A.   I -- I believe so, yes.

13        Q.   Okay.  We talked about Andie Richard earlier

14   today and her Twitter account.  And I believe your

15   testimony was that you followed her on Twitter?

16        A.   Yes.

17        Q.   We also have a screenshot of one of her tweets

18   that you said that you read.  Is that correct?

19        A.   Correct.

20        Q.   Was that a chain?  Were there more messages

21   below that, posted by Andie Richard?

22        A.   I know the one that -- there's -- there's a

23   screenshot of one more.  I'm not -- right now, I can't

24   recall if there were others below that.

25        Q.   And I'm asking because oftentimes, when I'm

Page 326

1    scrolling down Twitter, someone will make one, and then

2    it'll be a thread because there's a character count,

3    and there will be several on the same subject.

4         A.   Yes.

5         Q.   So I was curious if that might have been the

6    case with this tweet?

7         A.   I -- yeah, I don't -- I don't remember about

8    the specific tweet, if there were more.

9         Q.   Okay.  Did you review any other of her tweets?

10        A.   Again, as I'm sitting here, I can't remember

11   what I did and didn't see.

12        Q.   Have you ever clicked on her profile and

13   scrolled down?

14        A.   I did follow her, so I -- I would assume so.

15        Q.   Okay.  Did you -- and I'm not sure.  Maybe you

16   just answered it.  But did you come across any tweets

17   of hers about Victor Daniel Silva?

18        A.   I know she -- she posted regularly about him.

19   In that original tweet that I saw, she said, "It's been

20   a while since I posted about him."  And so if I saw

21   others, I -- again, I can't speak to that.

22        Q.   Okay.

23        A.   Yeah.

24        Q.   But as you're sitting here today, your

25   memory -- do you remember any other posts besides what

Page 327

1    was produced in an exhibit today?

2            A.    I don't remember, as I'm sitting here today,

3    any other posts.

4                    MR. SCHEXNAYDER:  Those are all the

5                    questions I have.  Thank you.

6                    THE WITNESS:  Thank you.

7                    RE-EXAMINATION

8    BY MS. GIERING:

9            Q.    Did you tell your parents about this incident?

10           A.    No, not until the article had been released.

11           Q.    When it was published?

12           A.    Yes, when it was published.

13           Q.    Did you give your parents a heads up that that

14   article was going to be published?

15           A.    No.

16           Q.    When Kenny Jacoby contacted you, did he

17   identify himself as a journalist with USA Today?

18           A.    Yes.

19           Q.    Okay.  He told you that he was investigating a

20   story about Victor Daniel Silva?

21           A.    Yes.

22           Q.    Okay.  Did he -- and he told you that's what

23   led him to you?

24           A.    Yes, I -- I believe so.

25           Q.    How did he find out about you?

Page 328

```
 1                    MS. BECK:  Objection; form.
 2          A.   As I'm sitting here right now, I -- I don't
 3     recall how --
 4     BY MS. GIERING:
 5          Q.   Did you ask him?
 6          A.   -- how he -- how he found out about me.
 7                    MS. BECK:  We're at -- we're at seven.
 8                    MS. GIERING:  Okay.
 9     BY MS. GIERING:
10          Q.   Just answer the question, the last question I
11     asked.
12          A.   I -- I don't recall, as I'm -- as I'm
13     sitting here, if I asked him.  Yeah, I don't -- I don't
14     recall.
15                    THE VIDEOGRAPHER:  Okay.  Counsel, you
16               want to let her know about reading and signing
17               before we go off the record.
18                    MS. BECK:  She will read and sign.
19                    THE VIDEOGRAPHER:  She will read and
20               sign, excellent.
21                    Okay.  We're going off the record.
22               This is the conclusion of the deposition of
23               Jane Doe.  The --
24                    Yeah.  Oh, I thought you were going to
25               tell me something.
```

Page 329

1           The time is 6:04.  We are off.

2        (This proceeding was concluded at 6:04 p.m. on

3     September 20, 2023.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 330

1                    REPORTER'S PAGE

2         I, YOLANDA J. PENA, Certified Court Reporter in

3    and for the State of Louisiana, (CCR #2017002),

4    Registered Professional Reporter (RPR #970346), the

5    officer, as defined in Rule 28 of the Federal Rules of

6    Civil Procedure and/or Article 1434(B) of the

7    Louisiana Code of Civil Procedure, do hereby state on

8    the record:

9         That due to the interaction in the spontaneous

10   discourse of the proceeding, double dashes (--) have

11   been used to indicate pauses, changes in thought,

12   and/or talkovers; that same is the proper method for a

13   transcription of proceedings, and that the double

14   dashes (--) do not indicate that words or phrases have

15   been left out of this transcript;

16        That any spelling of words and/or names which

17   could not be verified through reference material have

18   been denoted with the parenthetical "(phonetic)";

19        That the parenthetical "(sic)" is used to denote

20   when a witness stated a word or phrase that appears

21   odd or erroneous to show that it was quoted exactly as

22   it stands.

23

24                    YOLANDA PENA, CCR, RPR

25

Page 331

1                    REPORTER'S CERTIFICATE

2        I, YOLANDA J. PENA, Certified Court Reporter in
and for the State of Louisiana, Registered

3   Professional Reporter, and as the officer before whom
this testimony was taken, do hereby certify that JANE

4   DOE, after having been duly sworn by me upon authority
of R.S. 37:2554, did testify as set forth in the

5   foregoing 330 pages.
        I further certify that said testimony was reported

6   by me in the Stenotype reporting method, was prepared
and transcribed by me or under my direction and

7   supervision, and is a true and correct transcript to
the best of my ability and understanding.

8        I further certify that the transcript has been
prepared in compliance with transcript format

9   guidelines required by statute or by rules of the
board and that I have been informed about the complete

10  arrangement, financial or otherwise, with the person
or entity making arrangements for deposition services.

11       I further certify that I have acted in compliance
with the prohibition on contractual relationships, as

12  defined by Louisiana Code of Civil Procedure Article
1434, and in rules and advisory opinions of the board.

13       I further certify that I am not an attorney or
counsel for any of the parties, that I am neither

14  related to nor employed by any attorney or counsel
connected with this action, and that I have no

15  financial interest in the outcome of this matter.
        This certificate is valid only for this

16  transcript, accompanied by my original signature and
original raised seal on this page.

17

        Prairieville, Louisiana, this 4th day of October,
18  2023.

19

20

21

22
        YOLANDA J. PENA, CCR, RPR

23        CCR NO. 2017002, RPR NO. 907346

24

25