## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JANE DOE,

      Plaintiff,

v.                                                                    No.

BOARD OF SUPERVISORS OF THE                          Hon.
UNIVERSITY OF LOUISIANA SYSTEM;
BOARD OF SUPERVISORS OF LOUISIANA
STATE UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE; and
LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT;

      Defendants.

### COMPLAINT AND JURY DEMAND

Plaintiff JANE DOE, through her attorneys, The Fierberg National Law Group, PLLC

and Cazayoux Ewing Law Firm, brings this action against Defendant Board of Supervisors of the

University of Louisiana System ("Board of Supervisors" or "Board") for violation of her rights

under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, *et seq*. ("Title IX") and

negligence, and against Defendants Board of Supervisors of Louisiana State University and

Agricultural and Mechanical College ("LSU") and Lafayette City-Parish Consolidated

Government ("LCG") for negligence.

### INTRODUCTION

1.      On October 20, 2014, Louisiana Governor Bobby Jindal, in an Executive Order,

issued a statewide call to action regarding sexual assault, "a horrendous crime that creates

physical and emotional damage to victims." The Order acknowledged that public universities

had taken "outdated" and "fractured" approaches to student sexual assault and emphasized, "it is

incumbent upon the public officers and agencies, with a role to play in bringing the perpetrators

to justice and assisting the victims in their recovery, to coordinate their efforts to ensure that this vital issue is addressed immediately."

2.    Less than a year later, on June 23, 2015, the Executive Order was codified as "Act 172," also known as the "Campus Accountability and Safety Act." Like the Executive Order, the Act stressed that public entities' shared communications and coordinated efforts were vital to protecting college students from sexual assault. The Act mandated measures for universities to take to prevent students accused of sexual assault from escaping investigation or responsibility by transferring to new schools, and it required that universities and law enforcement share information concerning sexually-oriented offenses impacting student safety.

3.    Defendants, however, chose to disregard their most basic duties under Act 172, refused to share information concerning reports of student sexual assault, continued to employ disjointed approaches to sexual assault complaints, and, in the case of Defendants Board and LSU, ignored student rights guaranteed by Title IX. All of which enabled and emboldened Victor Daniel Silva ("Silva"), a serial sexual predator who raped Ms. Doe in September 2018, when they were both students at Louisiana Tech University ("Tech"). Unknown to Ms. Doe at that time, from 2014 to 2018, and before Ms. Doe ever met Silva, five women had reported Silva to Louisiana public universities and law enforcement for rape and other criminal sexual misconduct.

4.    LSU knew that, during Silva's first year of college, the 2014-2015 academic year, two female LSU students separately reported him for sexual assault, and the second allegation resulted in his arrest for second degree rape. In Spring 2015, LSU banned Silva from campus. While LSU may have acted to protect its own students from Silva, it nevertheless permitted Silva to transfer to the University of Louisiana at Lafayette ("UL Lafayette"), and never informed

anyone there about the full extent of Silva's reported sexual misconduct or that the allegations against him were so severe that LSU barred him from ever returning to campus.

5.      Through a fluke, and certainly not through any formal notification from LSU or its Title IX office, a UL Lafayette administrator learned of a news report concerning Silva's arrest for rape in Baton Rouge. UL Lafayette, unaware of the first sexual assault complaint against Silva or LSU's decision to ban him from the LSU campus, and apparently never having followed up with LSU or Baton Rouge law enforcement for additional information concerning Silva, believed that he had been accused of sexual assault just one time and merely placed him on disciplinary probation.

6.      From Spring 2015 to the end of the 2017-2018 academic year, while Silva attended UL Lafayette, three women reported him to the Lafayette Police Department ("Lafayette PD") for sex crimes, and at least one of those reports was referred to the District Attorney's office for a charging decision. However, the Lafayette PD did not inform UL Lafayette of these reports, in violation of Act 172 and, with respect to the last two complaints, a contractual agreement between law enforcement and the university.

7.      In Fall 2018, Silva transferred to Tech. At this point in time, Defendant Board of Supervisors – which operates, manages, and controls both Tech and UL Lafayette – knew that Silva had been arrested and booked for second degree rape in Baton Rouge, but took no steps to protect female Tech students from Silva or even provide them the information they needed to protect themselves.

8.      Within weeks of his first semester at Tech, Silva predictably targeted new prey, Ms. Doe. On September 18, 2018, Ms. Doe, after twice meeting Silva to study on campus, accepted an invitation to study with him at his apartment. That night, Silva raped Ms. Doe.

9.      Three days after Ms. Doe reported the rape to Tech, Defendant Board of Supervisors permitted Silva to transfer out of Tech, did not withhold Silva's transcript, and never investigated Ms. Doe's complaint or otherwise held Silva responsible for the <u>sixth</u> report of his sexual misconduct against female students. Ms. Doe was informed that, because Silva transferred, Tech's hands were tied and it could not take any action on her report.

10.     On May 26, 2021, Ms. Doe read an article authored by Kenny Jacoby, published that same day in USA Today entitled, "Six Women Reported a Louisiana College Student for Sexual Misconduct. No one connected the dots." The article focused on Silva and how Defendants had permitted him to escape responsibility for the many reports of his sexual misconduct. This was the first time Ms. Doe learned of the material facts forming the basis for her lawsuit, including but not limited to discovering that Defendants received prior reports of Silva's sexual misconduct, violated their mandatory obligations under Act 172, chose to disregard the substantial risk Silva posed of sexually assaulting students like Ms. Doe, and, in short, enabled Silva to rape her. She also learned for the first time that Defendant Board of Supervisors had permitted Silva to transfer back to UL Lafayette after she reported him for rape, where he remained under the Board's control and authority as a student, without investigation or any disciplinary action, until he graduated in 2019. These material facts were not previously known or reasonably knowable by Ms. Doe and, accordingly, her claims are timely filed.

11.     Ms. Doe seeks recovery for the significant damages she has suffered as a result of Defendant Board of Supervisors' deliberate indifference to the substantial risk posed by Silva and her report of his rape, and all Defendants' negligence, which has caused her to suffer severe physical, emotional, and other injuries.

## PARTIES

12.     Plaintiff Jane Doe resides in Monroe County, Indiana.[1]

13.     Defendant Board of Supervisors is a public constitutional corporation organized and existing under the laws of the State of Louisiana to supervise, operate, manage, and control public institutions of postsecondary education within the University of Louisiana system, including Tech and UL Lafayette. Defendant Board has a principal place of business located at 1201 North Third Street, Baton Rouge, Louisiana 70802. The Board is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a).

14.     Defendant LSU is a public constitutional corporation organized and existing under the laws of the State of Louisiana to supervise, operate, manage, and control the LSU public university system, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808. LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a).

15.     Defendant LCG is a local government subdivision of the State of Louisiana. The Lafayette PD is a division, agency, or department of Defendant LCG, and under the direction and supervision of the Mayor-President of Lafayette. Defendant LCG's principal place of business is in Lafayette, Louisiana.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this litigation involves claims arising under Title IX.

---

[1] Jane Doe will file a Motion to Proceed Under Pseudonym, in order to protect her identity and privacy as a rape victim bringing suit against governmental entities.

17.     This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367, as they are so related to Plaintiff's claims made under Title IX that they form part of the same case or controversy under Article III of the United States Constitution.

18.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different States.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants Board of Supervisors and LSU reside in East Baton Rouge Parish, which is part of the United States District Court for the Middle District of Louisiana.

## FACTUAL ALLEGATIONS

### *Executive Order No. BJ 2014-14*

20.     On October 20, 2014, Governor Jindal issued Executive Order No. BJ 2014-14 ("Executive Order"), entitled "Uniformity of Policies Related to the Crime of Sexual Assault."

21.     The Executive Order stated, "sexual assault is a horrendous crime that creates physical and emotional damage to victims, for which special measures must be taken by every public officer and agency in this state in order to bring the perpetrators to justice and assist the victims in their recovery[.]"

22.     The Order explained that separate measures implemented by individual public postsecondary educational institutions regarding the prevention and reporting of sexual assault were, "in some cases outdated and create a fractured approach" to the "critical issue" of sexual assault.

23.     The Order urged swift action, stating: "it is incumbent upon the public officers

and agencies, with a role to play in bringing the perpetrators to justice and assisting the victims in their recovery, to coordinate their efforts to ensure that this vital issue is addressed immediately."

24.     The Executive Order mandated that the Louisiana Board of Regents "coordinate uniform policies and best practices among the public postsecondary education institutions to implement measures to address the reporting of sexual assault on their campuses, the prevention of such crimes, and the medical and mental health care needed for these victims[.]"

### *Act 172*

25.     On June 23, 2015, Governor Jindal signed into law SB 255, commonly known as "Act 172" or the "Campus Accountability and Safety Act," that codified the Executive Order.

26.     Act 172 included an "[i]nter-campus transfer policy" that stated, "[t]he Board of Regents' Uniform Policy on Sexual Assault shall require that institutions communicate with each other regarding transfer of students against whom disciplinary action has been taken as a result of a code of conduct violation relating to sexually-oriented criminal offenses."

27.     Act 172 defines "institution" as "a public postsecondary education institution."

28.     Act 172 mandated that "[t]he Board of Regents' Uniform Policy on Sexual Assault shall require that institutions withhold transcripts of students seeking a transfer with pending disciplinary action relative to sexually-oriented criminal offenses, until such investigation and adjudication is complete."

29.     The statute also required: "Each institution and law enforcement and criminal justice agency located within the parish of the campus of the institution shall enter into a memorandum of understanding to clearly delineate responsibilities and share information in accordance with applicable federal and state confidentiality laws, including but not limited to

trends about sexually-oriented criminal offenses occurring against students of the institution."

30.     Each such memorandum of understanding was required to include, "[d]elineation

and sharing of investigative responsibilities" and "[a] method of sharing general information

about sexually-oriented criminal offenses occurring within the jurisdiction of the parties to the

memorandum of understanding in order to improve campus safety."

31.     Act 172 also mandated that "[t]he local law enforcement agency shall include

information on its police report regarding the status of the alleged victim as a student at an

institution as defined in this Part."

### *Uniform Policy on Sexual Misconduct*

32.     On August 26, 2015, the Board of Regents amended its Uniform Policy on Sexual

Misconduct ("Uniform Policy") to comply with Act 172.

33.     The Board of Regents instructed all public postsecondary educational institutions

and their management boards – which included Defendant Board of Supervisors – to begin

complying with the Uniform Policy immediately.

34.     The Uniform Policy stated, "[i]f a student accused of a sexually-oriented criminal

offense seeks to transfer to another institution during an investigation, the institution shall

withhold the student's transcript until such investigation or adjudication is complete and a final

decision has been made. Each institution shall inform the respondent of the institution's

obligation to withhold the transcript during the investigation."

35.     The Policy mandated, "each institution shall make diligent efforts to enter into [a]

Memorandum of Understanding with law enforcement and criminal justice agencies in the parish

in accordance with Act 172 or any other applicable state laws."

36.     Management boards – including Defendant Board of Supervisors – were also

required to ensure that they and their schools had policies that complied with applicable federal and state laws and regulations, including but not limited to Title IX and Act 172. The Policy specifically stated, "[e]ach management board, as the entity with the authority over the day-to-day operations of its member institutions, shall make all due diligence to monitor its member institutions' compliance with applicable laws and regulations," including Title IX and Act 172.

### *LSU Permitted Silva to Transfer and Did Not Inform*
### *UL Lafayette of a Sexual Assault Report against Silva*

37.     In Fall 2014, Silva attended his first semester of college as a freshman at LSU.

38.     Two months into the semester, a female LSU student ("Student 1") who met Silva in an English class reported to Baton Rouge law enforcement that Silva had raped her.

39.     The following day, law enforcement notified LSU of the report.

40.     LSU, which had no full-time Title IX employees, investigated the report and sided with Silva.

41.     Just weeks after LSU received the report, the university permitted Silva to transfer to UL Lafayette.

42.     LSU did not inform UL Lafayette of the sexual assault complaint against Silva.

43.     Although the Family Educational Rights and Privacy Act ("FERPA") generally prohibits the disclosure of personally identifiable information derived from education records, based on information and belief, one or more exceptions to that prohibition would have permitted LSU to share information concerning Silva's first reported sexual assault with UL Lafayette.

### *LSU Failed to Provide Material Information to a Second LSU Student and UL Lafayette*

44.     In January 2015, Silva began attending UL Lafayette.

45.     In March 2015, two months into his first semester at his new school, Silva

returned to Baton Rouge for a visit.

46.    After drinking at a bar near the LSU campus, a female LSU student ("Student 2") who had known Silva from the previous semester permitted him to enter her dorm room.

47.    Shortly thereafter, Student 2 reported that Silva had held her down and raped her at least three times over the span of three hours in her dorm room.

48.    On April 1, 2015, LSU Police obtained a warrant for Silva's arrest for second degree rape and booked him in the parish jail.

49.    In Louisiana, second degree rape and "forcible rape" are interchangeable terms, defined as:

> [R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
>
> (2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.

La. Rev. Stat. § 14:42.1.

50.    The penalty for second degree rape is severe. "Whoever commits the crime of second degree rape shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence." *Id.*

51.    LSU learned of the arrest and rape allegation against Silva, deemed him to be a "frequent flier," and banned Silva from campus.

52.    Since 2014, the U.S. Department of Education Office for Civil Rights required

that, when a student reports to her university that she was sexually assaulted by a student from a different school, the alleged victim's university should inform her that she has a right to file a Title IX complaint with the alleged perpetrator's school.

53.     However, LSU failed to inform Student 2 that she could file a Title IX complaint against Silva at his new school, UL Lafayette. Student 2 has publicly stated that, had LSU informed her of that right, she would have filed a Title IX complaint against Silva at UL Lafayette.

54.     Sometime after April 1, 2015, Carl Tapo, UL Lafayette Assistant Dean of Students, received an email from an LSU administrator with a news article about Silva's arrest for second degree rape in Baton Rouge. Based on information and belief, the article reported Silva had groped Student 2, held her down, and raped her, while she repeatedly told him to stop.

55.     However, LSU did not inform UL Lafayette of Student 1's report that Silva had raped her, which would have notified UL Lafayette that not just one student, but two female college students, had reported Silva for sexual assault and was deemed by LSU as a "frequent flier."

56.     Nor did LSU inform UL Lafayette that LSU had banned Silva from campus after learning of Student 2's report of rape, even though Silva was no longer an LSU student and LSU had well-documented disregard for Title IX and student sexual assault at the time.

57.     In short, LSU withheld information from UL Lafayette that indicated Silva was a serial sexual predator.

58.     Based on information and belief, one or more exceptions to FERPA's general prohibition on the disclosure of personally identifiable information derived from education records would have permitted LSU to share information concerning Silva's ban from campus

with UL Lafayette and/or Student 2.

59.    Moreover, based on information and belief, UL Lafayette did not take any steps to seek or obtain additional information regarding Silva's arrest or the reported rape that led to the arrest, from LSU, LSU Police, Baton Rouge law enforcement, or Student 2.

60.    Based on information and belief, UL Lafayette did not conduct any Title IX investigation into the report against Silva or make any determinations concerning his violation of the student code of conduct or responsibility for perpetrating sexual misconduct.

61.    Based on information and belief, at all relevant times hereto, Defendant Board of Supervisors did not provide or otherwise ensure that its administrators received training on Title IX, student sexual harassment, or Act 172.

62.    In June 2015, UL Lafayette – based solely on the report of Silva's arrest for his rape of Student 2 – placed him on disciplinary probation for two years and ordered him to attend behavior management sessions at the school health center.

63.    In August 2015, UL Lafayette employed Silva to work in a university program that provided tutoring to high school students.

### *Three Additional Women Reported Silva's*
### *Criminal Sexual Conduct to the Lafayette Police Department*

64.    Silva attended UL Lafayette for three years, beginning in the spring semester of 2015, through the end of the 2017-2018 academic year.

65.    During that time three other women reported Silva to the Lafayette PD for sex crimes.

66.    The Lafayette PD did not enter into a Memorandum of Understanding with UL Lafayette until January 2017, more than a year after Act 172 took effect.

67.    The Memorandum of Understanding required the Lafayette PD and District

Attorney's Office to "[n]otify UL Lafayette's Title IX Coordinator, to the extent [they] are able with respect to any confidentiality requirements, of any report of a sexually oriented criminal offense that may have occurred on its campus or involved a student as a victim or an accused."

68.     In November 2016, while Silva was still on disciplinary probation, a local community college student ("Student 3") reported to Lafayette PD Officer Jonathan Richard that, approximately one year earlier, she and Silva had consensual sex and, unknown to her, Silva had videorecorded it. Silva later sent her the video, she told him to delete it, and he blackmailed her, stating he would delete the video only in exchange for nude photographs of Student 3.

69.     In April 2018, a female UL Lafayette student ("Student 4") reported to Lafayette PD Detective James Gayle that she met Silva in 2016 through the UL Lafayette high school tutoring program, and the first time she and Silva hung out, he groped her and vaginally penetrated her against her will. The report was referred to the 14th Judicial District Attorney's Office for a charging decision.

70.     Less than two months later, another female UL Lafayette Student ("Student 5"), reported to Detective Gayle that Silva had sexually assaulted her in 2010, when they were both 14 years old, on the morning of their freshman orientation at St. Thomas More Catholic High School.

71.     Student 5 reported Silva because she had recently learned that, in 2010, he had also reportedly sexually assaulted a 12-year-old girl.

72.     Neither the Lafayette PD nor District Attorney's office notified UL Lafayette of these three reports regarding Silva.

73.     Based on information and belief, neither UL Lafayette nor Defendant Board of Supervisors took any steps to place the Lafayette PD or District Attorney's office on notice that

Silva was on disciplinary probation related to alleged second degree rape, and that it was imperative for law enforcement to notify UL Lafayette if Silva was accused of any other sexual misconduct.

74.    Based on information and belief, and given the disciplinary probation issued to Silva by UL Lafayette as a result of his arrest for rape in Baton Rouge, had the Lafayette PD and District Attorney's Office complied with the spirit of the Executive Order, the mandates of Act 172, or the letter of the Memorandum of Understanding with UL Lafayette, the school would have taken much more severe disciplinary action against Silva, up to and including suspension and/or expulsion.

75.    In 2018, just weeks after Lafayette PD received the third report regarding Silva's criminal sexual conduct, Silva transferred to Tech with a clean academic record that did not mention he had been on disciplinary probation as a result of his arrest for rape in Baton Rouge.

### _Silva Raped Jane Doe on the Night of September 18, 2018_

76.    In Fall 2018, Ms. Doe was a junior at Tech.

77.    In mid-September 2018, Ms. Doe met a fellow Tech student who identified himself only as "Daniel." He did not provide Ms. Doe with his last name.

78.    "Daniel" was, in fact, Victor Daniel Silva.

79.    The first time Ms. Doe and "Daniel" met in person, he and a female student that Ms. Doe knew were helping each other with homework. This, and the fact that "Daniel" was a Tech student and was living in an apartment complex known to house Tech students, lent "Daniel" a sense of credibility and trustworthiness in Ms. Doe's eyes, and it was for these reasons that she agreed to study and meet with him.

80.     The first two times Ms. Doe and "Daniel" met, they studied together in the library and Tolliver Hall, both on Tech's campus.

81.     During one of their study sessions, Ms. Doe met "Daniel's" roommate, who called himself "T."

82.     On Tuesday, September 18, 2018, "Daniel" invited Ms. Doe to study at the apartment he shared with "T."

83.     Ms. Doe accepted the invitation and drove to the apartment, where she and "Daniel" studied and later joined "T" and other friends who were socializing, drinking, and playing cards in the common area of the apartment.

84.     Ms. Doe drank at least four shots of whiskey in approximately one hour and became highly intoxicated.

85.     Ms. Doe informed "Daniel" that she was "incredibly drunk."

86.     "Daniel" repeatedly encouraged Ms. Doe to drink more alcohol and to spend the night at the apartment.

87.     When Ms. Doe realized that she was too intoxicated to drive home, she decided to stay the night at the apartment.

88.     "Daniel" expressly reassured Ms. Doe that, if she spent the night at the apartment, they would sleep separately.

89.     At approximately 1:00 a.m., while "Daniel" and others were still socializing in the common area of the apartment, Ms. Doe made her way to "Daniel's" bedroom and, fully clothed, fell asleep on his bed, intending to sleep off the alcohol she had consumed. She understood that "Daniel" would sleep on the couch in the apartment.

90.     Throughout that night, while Ms. Doe was highly intoxicated and in and out of consciousness, "Daniel" sexually assaulted and raped her.

91.     "Daniel" groped Ms. Doe's breasts, kissed her, and tried to remove her pants, all of which she resisted as best she could in her intoxicated state.

92.     Ms. Doe woke to find that "Daniel" had positioned her so that she was lying on her side at the edge of "Daniel's" bed, and he was standing beside her and forcing his penis into her mouth. Ms. Doe rolled away from him and said "no" multiple times.

93.     "Daniel" continued to grope Ms. Doe and tried to pull off her pants. She resisted and said "no."

94.     "Daniel" physically held down Ms. Doe and repeatedly tried to penetrate her vagina with his penis, without a condom, while she resisted and protested.

95.     Ms. Doe, attempting to stop the rape, told "Daniel" that she would not have sex without a condom.

96.     "Daniel" stated that he did not have a condom and said "I'm not f*cking stupid, I'm not going to come inside of you."

97.     "Daniel" continued to physically restrain Ms. Doe, and he penetrated her vagina with his penis, without wearing a condom.

98.     When the rape was over, Ms. Doe, still highly intoxicated, again lost consciousness.

99.     The next morning, on September 19, 2018, Ms. Doe left "Daniel's" apartment while he was sleeping.

100.    That same day, Ms. Doe told two people about the rape. The first person was Kayla, Ms. Doe's friend, and the second was Kaiti Lammert, Assistant Director of the Wesley Foundation, a Christian ministry at Tech.

101.    Later that day, "Daniel" texted Ms. Doe and asked her to study with him again.

102.    Ms. Doe responded and reminded "Daniel" that the previous night he knew she was not sober and was uncomfortable with and did not want to have sex. Ms. Doe told "Daniel" she did not want to ever see him again. Ms. Doe blocked "Daniel's" telephone number.

103.    Over the next few days, Ms. Doe told a few additional people she trusted about the assault, including Ryan Ford, the Director of the Wesley Foundation.

104.    Ms. Doe did not report "Daniel" to Tech or law enforcement because "Daniel" had never informed her of his last name, and she was afraid that her word would mean nothing.

105.    Ms. Doe frequently encountered "Daniel" on campus, which frightened her and caused the trauma she had experienced from the rape to resurface. Ms. Doe altered her usual conduct and began avoiding certain areas of campus, in order to avoid encountering the rapist she knew only as "Daniel."

### *Ms. Doe Reported Silva to Defendant Board of Supervisors*

106.    On December 11, 2018, while Ms. Doe was in a meeting with Wesley Foundation Director Ford, she saw a sorority group chat with a picture of "Daniel," stating that he had sexually assaulted other women, and that his real name was Victor Daniel Silva.

107.    Ms. Doe, recognizing the man in the picture as "Daniel," the same man who had raped her, determined that she would report him to Tech, in an attempt to stop his serial sexual assault of women and hold him responsible for raping her.

108.    Ms. Doe informed Mr. Ford of the group chat and information, and Mr. Ford text messaged Sam Speed, the Dean of Student Engagement and Undergraduate Recruitment at Tech, requesting advice about how a student should report rape to Tech.

109.    On December 14, 2018, Ms. Doe, accompanied by Ms. Lammert, went to the office of Carrie Flournoy to report Silva.

110.    Based on information and belief, Ms. Flournoy was the Executive Assistant to the University President and Tech's part-time Title IX Coordinator.

111.    Ms. Flournoy told Ms. Doe that the university had been receiving calls and reports about Silva, and they were "waiting for someone to come forward with an accusation against him." Ms. Flournoy stated that the Chief of the University Police was looking into Silva's past.

112.    Ms. Flournoy called the University Police.

113.    Ms. Flournoy took Ms. Doe and Ms. Lammert to the University President's office, where Ms. Doe reported Silva's sexual assault to University Police Lieutenant Patrick Simmons and Ms. Flournoy.

114.    Ms. Doe then immediately went to the Ruston Police Department, and she again reported Silva's sexual assault and rape.

115.    Based on information and belief, either a Tech or Ruston Police Department employee informed Silva that Ms. Doe reported he had raped her.

### *Defendant Board Permitted Silva to Transfer to Another School in the University System, Without Consequence*

116.    On December 17, 2018, six days after she had reported Silva, Ms. Doe attended a meeting with Dickie Crawford, Associate Vice President for Student Advancement, and Adam

Collins, Director of Student Conduct and Academic Integrity. Ms. Doe's friend, Kayla, also attended the meeting.

117.    During the meeting, the University administrators informed Ms. Doe that Silva had withdrawn from Tech three days after she had reported him to the school and law enforcement, and that they would not investigate him or Ms. Doe's report. The administrators told Ms. Doe that, if Silva reenrolled at Tech, they would call her back to get her testimony against Silva.

118.    Unknown to Ms. Doe, Defendant Board of Supervisors permitted Silva to transfer back to UL Lafayette, another school it controlled, for the next semester starting in January 2019.

119.    No administrator or other employee of Defendant Board took any action concerning Ms. Doe's report of Silva, nor did they inform Ms. Doe that she could file a Title IX or other complaint regarding him at any other educational institution, including UL Lafayette.

120.    Defendant Board of Supervisors did not investigate Ms. Doe's report or Silva.

121.    Significantly, Defendant Board violated its own school policy, which it had adopted pursuant to Act 172, by not withholding Silva's transcript after Ms. Doe reported him.

122.    That policy stated, in pertinent part: "If a student accused of a sexually-oriented criminal offense seeks to transfer to another institution during an investigation, the institution shall withhold the student's transcript until such investigation or adjudication is complete and a final decision has been made."

123.    Ms. Doe never again heard from Tech, Defendant Board of Supervisors, or the Ruston Police Department regarding any investigation of or charges against Silva.

124.    Tech provided Ms. Doe with no Title IX paperwork, report, or outcome, and never even asked that Ms. Doe prepare a written statement regarding Silva's sexual assault.

***On May 26, 2021, Ms. Doe Learned Previously Unknown and Unknowable
Material Facts Concerning Defendants' Egregious Actions and Inaction***

125.    On May 26, 2021, USA Today published an article written by Kenny Jacoby,

entitled "Six Women Reported a Louisiana College Student for Sexual Misconduct. No One

Connected the Dots."

126.    Mr. Jacoby's article revealed that Silva was a serial sexual predator, enabled by

Defendants' refusals to hold him responsible or otherwise prevent him from continuing to rape

and sexually assault women.

127.    Ms. Doe read the article the day it was published.

128.    Upon reading the article, Ms. Doe learned for the first time that:

    a.    Prior to Silva raping her, LSU had notice of two reported sexual assaults
        (Students 1 and 2) perpetrated by Silva.

    b.    LSU had banned Silva from campus.

    c.    UL Lafayette knew that Silva had been arrested for raping Student 2 and
        had placed him on disciplinary probation for two years.

    d.    While Silva attended UL Lafayette, three other women – Students 3, 4,
        and 5 – reported to LCG that he had committed sex crimes against them.

    e.    LCG had entered into a Memorandum of Understanding with UL
        Lafayette that required it to notify the school's Title IX Coordinator of any
        report of a sexually-oriented criminal offense that involved a student as a
        victim or an accused, and LCG violated that agreement when it failed to
        report complaints made by Students 4 and 5 to UL Lafayette.

    f.    UL Lafayette allowed Silva to transfer to Tech, with a clean record.

    g.    Defendant Board of Supervisors permitted Silva to transfer back to UL
        Lafayette, without withholding his transcript, even though Ms. Doe had
        just reported that Silva had raped her.

    h.    Defendant Board never investigated or disciplined Silva in connection
        with his reported rape of Ms. Doe.

129.    Ms. Doe learned, for the first time, that Defendants' refusals to, at the very least, comply with Act 172 and Title IX resulted in Silva's rape of her, and that Defendant Board of Supervisors chose not to investigate Silva or hold him responsible for that rape in any way.

130.    Each of Ms. Doe's claims asserted herein were equitably tolled pursuant to the doctrine of *contra non valentem agree non currit praescriptio*, which means "no prescription runs against a person unable to bring an action." *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776, 786 (5th Cir. 1963).

131.    The doctrine tolls prescription in circumstances where, *inter alia*, "the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant." *Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427, 438 (5th Cir. 2021). In such a case, "the prescriptive period begins to run 'on the date the injured party discovers or should have discovered the facts upon which his cause of action is based.'" *Id.* (citation omitted).

132.    Here, even with reasonable diligence, Ms. Doe could not have discovered the material facts that were uncovered only by Mr. Jacoby, an accomplished and highly experienced investigative journalist, through multiple sources, including Students 1 through 5; interviews; official statements; requests; and other information, particularly given FERPA's general prohibition on disclosing the personally identifying information of students.

133.    Ms. Doe has struggled greatly and suffered significant physical and emotional injuries, among others, as a result of Defendants' egregious actions and inactions.

**COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**Pre- and Post-Assault Deliberate Indifference**
**(Defendant Board of Supervisors)**

134.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

135.    At all relevant times, Defendant Board of Supervisors was a federal fund recipient within the meaning of Title IX.

136.    Carl Tapo, UL Lafayette Assistant Dean of Students, was an "appropriate person" within the meaning of Title IX because he had the ability to, and did, address Silva's reported sexual misconduct and institute corrective measures on behalf of Defendant Board of Supervisors.

137.    Defendant Board of Supervisors had actual notice that there was a substantial risk that Silva would sexually assault female students no later than June 2015, when Mr. Tapo learned that a female LSU student reported that Silva had held her down and raped her, while she repeatedly told him to stop, and that in connection with this report Silva had been arrested and detained for second degree rape.

138.    When Silva transferred to Tech, Defendant Board of Supervisors retained control over him, as Tech is a school that falls under the Board's management, supervision, and control.

139.    Defendant Board of Supervisors was deliberately indifferent to the actual notice that Silva had reportedly raped a female college student and the substantial risk that he would similarly sexually assault other female college students.

140.    Through its acts and omissions, Defendant Board of Supervisors acted with deliberate indifference to the actual notice it received concerning Silva by, among other things:

       a.    Failing to protect Ms. Doe from Silva;

b.    Failing to take meaningful measures to prevent Silva from sexually assaulting female students;

c.    Failing to investigate Student 2's report that Silva raped her, including but not limited to by requesting additional information from LSU concerning Silva's sexual misconduct and any disciplinary actions taken against him, and failing to request additional information from Baton Rouge law enforcement or Student 2;

d.    Failing to conduct a Title IX investigation of Silva in connection with the report that he raped Student 2 or make a determination whether he was responsible for engaging in sexual harassment and/or violation of the student code of conduct;

e.    Failing to inform the Lafayette PD or District Attorney's Office that Silva was on disciplinary probation and the importance of reporting to the school when any other complaints were made concerning his alleged criminal sexual misconduct;

f.    Failing to ascertain whether any additional female students reported Silva to Lafayette PD for sexual misconduct;

g.    Failing to provide adequate Title IX and/or Act 172 training and education to administrators about investigating and responding to reports of student sexual harassment;

h.    Failing to comply with the Executive Order, Act 172, Uniform Policy, and/or its own sexual harassment policy, all of which were intended to protect students like Ms. Doe from sexual assault; and

i.    Permitting Silva to transfer to Tech, with a clean record and no notification to Tech Title IX staff or other administrators of his prior arrest for rape or disciplinary probation at UL Lafayette.

141.    Defendant Board of Supervisors' response to the actual notice it received concerning Silva was clearly unreasonable in light of the known circumstances, particularly in light of the Executive Order, Act 172, and the Uniform Policy, all of which stressed the importance of and mandated cooperation between public postsecondary universities and law enforcement with respect to student sexual assault.

142.    As a direct and proximate result of Defendant Board's action, inaction, and deliberate indifference, Ms. Doe was raped by Silva.

143.    Silva's rape of Ms. Doe included forced vaginal rape, while he was not wearing a condom, and forced oral sodomy, which was so severe, pervasive, and objectively offensive, that it effectively barred Ms. Doe's access to educational opportunities and benefits.

144.    Defendant Board of Supervisors had actual notice of Silva's rape of Ms. Doe when she reported it to Tech's Title IX Director Carrie Flournoy and University Police Lieutenant Patrick Simmons on December 14, 2018.

145.    Ms. Flournoy and/or Lieutenant Simmons were "appropriate persons" within the meaning of Title IX because they had the ability to address Silva's reported rape of Ms. Doe and institute corrective measures on behalf of Defendant Board of Supervisors.

146.    When Ms. Doe reported Silva's rape to Tech, and after he was permitted to transfer from Tech back to UL Lafayette, Defendant Board of Supervisors retained control over him, as both Tech and UL Lafayette are schools that fall under the Board's management, supervision, and control.

147.    Through its acts and omissions, Defendant Board of Supervisors acted with deliberate indifference to the actual notice it received concerning Silva's rape of Ms. Doe by, among other things:

    a.    Refusing to conduct a Title IX, or any other, investigation of the report that Silva raped Ms. Doe;

    b.    Permitting Silva to transfer out of Tech and back to UL Lafayette, and to avoid an investigation or disciplinary consequences for his reported rape of Ms. Doe;

    c.    Refusing to withhold Silva's transcript, as required by Act 172 and the school's own policy;

    d.      Refusing to investigate Silva even though he remained under Defendant Board of Supervisors' control as a student at UL Lafayette;

    e.      Failing to inform Ms. Doe that Silva had transferred back to UL Lafayette, and that she could file or otherwise pursue a Title IX complaint against him at that school;

    f.      Failing to comply with the Executive Order, Act 172, Uniform Policy, and/or its own sexual harassment policy, all of which were intended to protect students like Ms. Doe from sexual assault; and

    g.      Failing to provide adequate Title IX and/or Act 172 training and education to administrators on investigating and responding to reports of student sexual harassment.

148.    Defendant Board of Supervisors' response to the actual notice it received concerning Silva's rape of Ms. Doe was clearly unreasonable in light of the known circumstances, particularly in light of Act 172, which prohibited universities from allowing students accused of sexual assault to transfer schools in order to avoid investigation and disciplinary consequences.

149.    As a direct and proximate result of Defendant Board of Supervisor's action, inaction, and deliberate indifference, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to physical injury and pain, impaired educational capacity, breach of contract, and attorney fees and costs.

**COUNT II**
**Negligence Under Louisiana State Law**
**(Defendant Board of Supervisors)**

150.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

151.    Defendant Board of Supervisors, individually and by and through its agents, owed duties to Ms. Doe and other students to prevent, investigate, and appropriately discipline students

like Silva who were accused of criminal sexual misconduct in a reasonably prudent matter to

protect students from sexual assault.

152.    Defendant Board of Supervisors breached its duties, and was negligent, by, *inter*

*alia*:

     a.     Failing to protect Ms. Doe from Silva;

     b.     Failing to take meaningful measures to prevent Silva from sexually assaulting female students;

     c.     Failing to investigate Student 2's report that Silva raped her, including but not limited to by requesting additional information from LSU concerning Silva's sexual misconduct and any disciplinary actions taken against him, and failing to request additional information from Baton Rouge law enforcement or Student 2;

     d.     Failing to investigate Silva in connection with the report that he raped Student 2 or to make a determination whether he was responsible for engaging in sexual harassment and/or violation of the student code of conduct;

     e.     Failing to inform the Lafayette PD and District Attorney's Office that Silva was on disciplinary probation and the importance of reporting to the school when any other complaints were made concerning his alleged criminal sexual misconduct;

     f.     Failing to ascertain whether any female students reported Silva to Lafayette PD for sexual misconduct;

     g.     Permitting Silva to transfer to Tech, with a clean record and no notification to Tech Title IX staff or other administrators of his prior arrest for second degree rape or disciplinary probation at UL Lafayette;

     h.     Refusing to conduct a Title IX, or any other, investigation of the report that Silva had raped Ms. Doe;

     i.     Permitting Silva to transfer out of Tech and back to UL Lafayette, and to avoid an investigation and disciplinary consequences for his reported rape of Ms. Doe;

     j.     Refusing to withhold Silva's transcript, as required by Act 172 and the school's own policy;

k.   Refusing to investigate Silva even though he remained under Defendant Board of Supervisors' control as a student at UL Lafayette;

l.   Failing to inform Ms. Doe that Silva had transferred back to UL Lafayette, and that she could file a Title IX complaint against him at that school;

m.   Failing to provide adequate Title IX and/or Act 172 training and education to administrators on investigating and responding to reports of student sexual harassment; and

n.   Failing to comply with the Executive Order, Act 172, Uniform Policy, and/or its own sexual harassment policy, all of which were intended to protect students like Ms. Doe from sexual assault.

153.   Particularly given the Executive Order, Act 172, and Uniform Policy, it was entirely foreseeable that Defendant Board of Supervisors' breaches would result in Silva's sexual assault of yet another female student.

154.   Defendant Board is not entitled to state immunity because its actions were not discretionary, were made at the operational level, and/or were not based upon considerations of public policy.

155.   As a direct and proximate result of Defendant Board of Supervisors' negligent actions and inaction, Ms. Doe was raped by Silva, a rape that went uninvestigated, addressed, or remedied, and caused Ms. Due to endure great physical, emotional, and mental suffering, for which she is entitled to be compensated.

**COUNT III**
**Negligence Under Louisiana State Law**
**(Defendant LSU)**

156.   Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

157.    Defendant LSU, individually and by and through its agents, owed duties to Ms. Doe and other students to report students who were accused of criminal sexual assault to UL Lafayette in a reasonably prudent matter to protect students from sexual assault.

158.    Defendant LSU breached its duties, and was negligent, by, *inter alia*:

    a.    Failing to inform UL Lafayette that Student 1 had reported Silva for sexual assault;

    b.    Failing to inform UL Lafayette that LSU had banned Silva from ever returning to its campus;

    c.    Failing to inform Student 2 of her right to file or otherwise pursue a Title IX complaint against Silva at his new university, UL Lafayette;

    d.    Failing to provide adequate Title IX and/or Act 172 training and education to administrators on investigating and responding to reports of student sexual harassment; and

    e.    Failing to comply with the Executive Order, Act 172, Uniform Policy, all of which were intended to protect students like Ms. Doe from sexual assault.

159.    Particularly given the Executive Order, Act 172, and Uniform Policy, it was entirely foreseeable that Defendant Board of Supervisors' breaches would result in Silva's sexual assault of yet another female student.

160.    Defendant Board is not entitled to state immunity because its actions were not discretionary, were made at the operational level, and/or were not based upon considerations of public policy.

161.    As a direct and proximate result of Defendant LSU's negligent actions and inaction, Ms. Doe was raped by Silva and caused Ms. Due to endure great physical, emotional, and mental suffering, for which she is entitled to be compensated.

## COUNT IV
### Negligence Under Louisiana State Law
### (Defendant LCG)

162.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

163.    Defendant LCG, individually and by and through its agents, owed duties to Ms. Doe and other students to report students who were accused of criminal sexual assault to UL Lafayette in a reasonably prudent matter to protect students from sexual assault.

164.    Defendant LCG, by entering into the Memorandum of Understanding with UL Lafayette, voluntarily undertook the duty to share with UL Lafayette's Title IX Coordinator reports that students like Silva were accused of committing a sexually-oriented criminal offense.

165.    Defendant LCG thereby assumed the duty to exercise reasonable care in carrying out its responsibilities in reporting students accused of committing sexually-oriented criminal offenses, including Silva, to UL Lafayette's Title IX Coordinator.

166.    Defendant LCG knew, or should have known, that UL Lafayette was relying upon it to exercise reasonable care in carrying out its responsibilities under the Memorandum of Understanding.

167.    Defendant LCG breached its duties, and was negligent, by, *inter alia*:

a.    Failing to inform UL Lafayette of three reports that Silva engaged in criminal sexual activities against female students (Students 3, 4, and 5);

b.    Failing to comply with the Executive Order and Act 172;

c.    Violating its Memorandum of Understanding with UL Lafayette by not reporting allegations of Silva's criminal misconduct to the university;

d.    Failing to take reasonable care to undertake its responsibilities under the Memorandum of Understanding; and

    e.      Failing to take meaningful measures to prevent Silva from sexually assaulting other female students.

168.    Particularly given the Executive Order, Act 172, and Uniform Policy, it was entirely foreseeable that Defendant LCG's breaches would result in Silva's sexual assault of yet another female student, Ms. Doe.

169.    Defendant LCG is not entitled to state immunity because its actions were not discretionary, were made at the operational level, and/or were not based upon considerations of public policy.

170.    As a direct and proximate result of Defendant LCG's negligent actions and inaction, Ms. Doe was raped by Silva and endured great physical, emotional, and mental suffering, for which she is entitled to be compensated

## JURY DEMAND

Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

Plaintiff respectfully prays the Court for judgment against Defendants, jointly and severally, awarding Plaintiff compensatory and consequential damages in an amount to be established at trial, for an award of reasonable attorneys' fees and costs against Defendant Board of Supervisors, pursuant to 42 U.S.C. § 1988(b), and such other relief as the Court may deem just and proper under the circumstances.

Dated:  May 25, 2022                              Respectfully submitted,

**THE FIERBERG NATIONAL
LAW GROUP, PLLC**
Monica H. Beck – Lead Attorney
  (*pro hac vice application to be filed*)
Chloe M. Neely
  (*pro hac vice application to be filed*)
161 East Front Street, Suite 200
Traverse City, MI  49684
Telephone: (231) 933-0180
Facsimile: (231) 252-8100
Email: mbeck@tfnlgroup.com
Email: cneely@tfnlgroup.com


/s/ J. Lane Ewing, Jr.
**CAZAYOUX EWING LAW FIRM**
Donald J. Cazayoux, Jr. (LBN 20742)
J. Lane Ewing, Jr. (LBN 29854)
257 Maximilian Street
Baton Rouge, LA  70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
Email: don@cazayouxewing.com
Email: lane@cazayouxewing.com

*Attorneys for Plaintiff Jane Doe*